NANCY CALHOUN, Respondent, *v.* BENJAMIN CALHOUN and JESSIE CALHOUN, Appellants, Impleaded with Another.

*Agreement to support a parent — sustained by the consideration of love and affection — how a breach of the agreement must be evidenced — demand for the support.*

The love and affection which exist between a mother and son, and the moral obligation devolved upon the son by that relationship, furnish an adequate consideration for a promise by the son to maintain and clothe the mother during her life, in his family or upon his farm.

Where the mother, in consequence of a quarrel with the son, removes from the son's premises to a house provided by him, and the son thereafter continues to contribute to the mother's support, the latter cannot maintain an action to foreclose a mortgage given to her by the son, to secure the performance of his promise, upon the ground that the support furnished her is inadequate, unless she demands additional support or at least acquaints the son with her necessities in that regard.

APPEAL by the defendants, Benjamin Calhoun and another, from a judgment of the Supreme Court in favor of the plaintiff, entered

in the office of the clerk of the county of Jefferson on the 30th day of June, 1899, upon the report of a referee adjudging $900 to be due on a mortgage held by the plaintiff and decreeing the foreclosure thereof, with notice of an intention to bring up for review upon such appeal the order confirming said report.

The action was commenced on the 25th day of February, 1897, to foreclose a certain mortgage made and executed by the defendant Benjamin Calhoun and Jessie Calhoun, his wife, and delivered to the plaintiff. The mortgage bears date December 1, 1885, is acknowledged January 11, 1886, was recorded in Jefferson county clerk's office January 27, 1886, in liber 132 of Mortgages, page 441, and covers a farm of 110 acres of land situate on Grindstone island, in the county of Jefferson. The consideration expressed is $600, and the mortgage contains the following covenant : " Whereas, the party of the first part (the defendant Benjamin Calhoun), for a good and valuable consideration to him in hand paid by Nancy Calhoun (the plaintiff), the party of the second part herein, does hereby covenant and agree, for himself, his heirs, executors and administrators, to and with the said Nancy Calhoun, that he will support and comfortably maintain and sufficiently clothe the said Nancy Calhoun, in sickness and health, for and during the rest, residue and remainder of her natural life, in his family or upon the said premises hereinbefore describe, but not without the county of Jefferson, without her consent. Therefore, this grant is intended for security for the said support and maintenance * * * as hereinbefore stated, and this conveyance shall be void if such support and maintenance be made as herein specified. And in case default shall be made in the support and maintenance hereby intended to be secured as above provided, it shall be lawful for the party of the second part, her executors, administrators and assigns, at any time thereafter, to sell the premises hereby granted, or any part thereof, in the manner prescribe by law, keeping all moneys arising from such sale, and to retain the same for the purposes aforesaid, and of paying costs of sale."

The plaintiff, who, at the time of the trial (1897), was sixty-eight years of age, resided with her family for many years prior to 1875 upon a farm of sixty acres owned by her, situate upon Grindstone island, in the county of Jefferson, N. Y. The defendant, who is the plain-

tiff's son, has been engaged in sailing upon the Great Lakes since he was sixteen years old ; his earnings, until he reached his majority, were used for the support of his parents' family, with whom he lived during the winter months. With the money which the defendant accumulated after reaching his majority, and in the year 1875, he purchased a farm adjoining the plaintiff's, and the family then moved on to it, the buildings on the plaintiff's farm having become substantially untenantable. From that time on for many years the plaintiff managed and with her family occupied both farms, and the entire proceeds were used for the support of herself and family, which consisted of herself, her husband and five or six children.

By the year 1879 the plaintiff had become involved in debt to a considerable amount ; the defendant claims in sums aggregating between $600 and $700 ; the plaintiff claims the amount did not exceed $250. No acccurate accounts were kept, and it is scarcely possible to determine from the evidence, even approximately, the correct amount. At all events, in April, 1879, the plaintiff deeded her farm of sixty acres to the defendant, in consideration of the payment by him of the plaintiff's indebtedness, and the execution and delivery of a mortgage back, containing a covenant by which the defendant obligated himself to suitably maintain and support the plaintiff and her husband upon said farm, or in his family, but not without the county of Jefferson, during their natural lives.

In October, 1879, the plaintiff's husband died, and in January, 1881, the plaintiff satisfied the mortgage last referred to, and it was discharged of record. The defendant claims that the consideration for the satisfaction of the mortgage was the cancellation of an indebtedness which was owing to him by the plaintiff, and the payment by him of demands which she owed to other persons, in all amounting to the full value of the mortgage. The plaintiff claims that at the time she was not indebted to the defendant in any amount, and that he did not pay any other debts for which she was liable, or at her request, and that the satisfaction was entirely without consideration, except that the defendant agreed that he would execute and deliver to her another mortgage to take the place of the one satisfied, and containing a covenant on his part to maintain and support her during her natural life, or make other suitable provision therefor.

Notwithstanding the plaintiff ceased to have any title to or interest in the farms in question, which was evidenced by any writing, the relations between the parties continued the same as before, the plaintiff with her family, then consisting of her son Emmett and one daughter, occupying both farms and receiving the avails thereof. The defendant lived with them each winter, and at the end of each year paid such deficiency as arose on account of running the farm.

In the year 1885 the defendant married, and shortly thereafter, and so far as appears without demand or request on the part of the plaintiff, he voluntarily executed and delivered to her the mortgage in suit, for the reason, as he stated at the time, that he feared his vessel might be lost, himself and wife drowned, and in that case he desired that there should be some provision for the support of the plaintiff during her life, so that she would not be dependent upon the other children.

For nearly ten years after the execution and delivery of the mortgage in suit (1885 to 1895) the plaintiff, her son Emmett and her daughter, resided upon and managed the two farms as one; had the entire proceeds therefrom, except what was expended in making some improvements, and the defendant each year paid the taxes and other expenses, amounting to a considerable sum. The only benefit which the defendant derived from the farm during the entire period was the partial support of his young children, who lived with the plaintiff a portion of the time, and he and his wife made it their home during the winters. No account of receipts and disbursements was kept by the plaintiff, or by her son Emmett. They dealt with the farm as if their own, sold the products and stock at will, and used the proceeds for their own purposes and as they saw fit, the defendant making good the deficiency which invariably existed at the end of each year.

In the early part of 1895, the plaintiff's daughter having married one Edgar Garnsey, and the defendant being about to marry a second wife, which he did in March, 1895, his first wife having died, the defendant determined to dispense with the services of the plaintiff's son Emmett, and that he would not longer have him upon the farm. The evidence tends to show that Emmett had become a worthless character, dissipated and impudent. At all

events, he and the defendant did not get on together, and the defendant was under no obligation to employ him, contribute to his support or have him upon the farm, unless he so desired. The defendant thereupon rented the farm to his brother-in-law, Edgar Garnsey. That greatly angered the plaintiff, and the defendant claims that she stated in the most positive and violent way that if Emmett did not remain and Garnsey came, she would not stay on the farm; that she called him (the defendant) vile names, threatened him with bodily harm, and that she would burn all the buildings, and demanded that he should provide a place for her to live in Thurso. The defendant says that he tried to persuade her not to go to Thurso, and offered to build a house for her on the farm, but that she would not consider such a proposition.

The plaintiff's version of the transaction is entirely different. She says that she did not suggest that she would leave, but that the defendant told her she must leave; that he threatened to do her bodily injury; threatened to kill her son Emmett, called her vile names, and, in short, that his treatment of her was such as to make it unsafe for her to remain; that she was anxious to stay and only left because compelled to.

As a result of the quarrel the defendant purchased a comfortable house in the village of Thurso, about two miles from the farm, for the plaintiff to live in, and in March, 1895, she moved into it, taking with her from the farm substantially all the household furniture and utensils, one cow, a pig, sixteen hens, a quantity of provisions, wood, etc. The defendant claims that the plaintiff so moved from and left the farm, and took the property above mentioned, not only voluntarily, but under the express agreement that if he would make such provision for her she would release him from all obligation to support her in the future, on account of the mortgage in suit or otherwise.

The plaintiff insists that no such agreement was made, but that, on the contrary, she left the farm because she was compelled to on account of defendant's cruel treatment, and that she moved into the Thurso house because she had no other place to go, and that she took the property which she did as a matter of necessity and to provide for her immediate wants.

The plaintiff has continued to reside in the Thurso house since she

moved there in March, 1895, and the defendant has contributed to her support, to some extent at least, each year, sufficiently, he claims, to provide for her needs, considering the rental value of the portion of the house not required by her (fifty dollars per year), and the use of the land connected therewith, and that, considering her station in life, she has had enough to suitably maintain and support her, except for the fact that she persists in furnishing a home for and supporting her son Emmett.

The plaintiff insists that the amount contributed by the defendant, from the time she moved to Thurso until this action was commenced, was entirely inadequate for her maintenance, and that during the greater part of the time she has necessarily been almost destitute and has suffered for the necessaries of life.

It, however, appears by the evidence, and is uncontradicted, that since the plaintiff moved to Thurso, and up to the time this action was begun, she has not made any demand or request upon the defendant to furnish anything for her support which he has not complied with, and that she has not requested to be permitted to return and reside upon the farm or with the family of the defendant or offered so to do.

The foregoing is but a skeleton of the facts bearing upon the unfortunate controversy existing between the mother and son, parties to this action.

*E. C. Emerson*, for the appellant.

*George E. Morse*, for the respondent.

McLENNAN, J. :

The defendant seeks to prevent a recovery in this case upon three grounds :

1. Because the mortgage in suit was executed and delivered without consideration ;

2. Because, even if the covenant to support the plaintiff constituted a valid and binding obligation upon the defendant, there was no such breach of the covenant as would entitle the plaintiff to maintain this action, and

3. It is insisted that, in any event, there not having been a total breach of the covenant, the plaintiff is not entitled to recover in this action for future support.

The dealings between the plaintiff and defendant, prior to the time the mortgage in suit was executed, cover a period of a dozen years or more. No books of account of the transaction between them were kept. The plaintiff, at least, was ignorant and unable to make memoranda or keep accounts, and both seem to be wholly unacquainted with business methods.

In 1875 the defendant became the owner of a farm of fifty-one acres. What it was worth, or its rental value, does not appear. The plaintiff and her family occupied it for years, and practically had the products. Their amount or value is not disclosed by the evidence. Certain improvements were made, but the cost or extent is not shown. In 1879 the plaintiff's farm, which she then deeded to the defendant, according to the consideration expressed in the deed, was worth $1,200. That amount, if paid at all, and some part of it concededly was, was paid by the cancellation of an indebtedness which the plaintiff owed to the defendant, and by the payment by him of debts which she owed to others. The amount of such indebtedness or debts is not ascertainable from the evidence. There is no data from which the inference can be drawn that prior to 1885, the date of the mortgage in suit, the $1,200, the purchase price of the plaintiff's farm, had been fully paid. The inference that there remained unpaid of the purchase price the value of the mortgage is quite as justifiable.

At the time the mortgage in suit was given everything was apparently harmonious between the parties. No account of their dealings was kept; the earnings of all seem to have gone into the common fund for their mutual benefit. It is apparent that the defendant was the only money-earner and money-saver of the family, and that he was willing to provide a home for his parents, and to aid in the support of the other children until they could care for themselves, and that the amount thus expended by him he did not expect to be reimbursed for, except by becoming the owner of the farm, free from all claims of the other children, upon the death of the plaintiff.

When the mortgage in suit was executed the defendant obligated himself, and intended so to do, to support the plaintiff during her natural life, and it is immaterial whether he assumed such obligation wholly in payment for the farm which she had conveyed to

him, or partly in payment for such conveyance, and partly on account of love and affection and in discharge of the moral obligation which devolved upon him by reason of his relationship to her. Either or both would furnish an adequate consideration to support the mortgage. (*Morris* v. *Ward*, 36 N. Y. 587; *Loeschigk* v. *Hatfield*, 51 id. 660; *Spalding* v. *Hallenbeck*, 30 Barb. 292.)

The conclusion is reached that the evidence justified the finding made by the learned referee, that the covenant contained in the mortgage in suit was made upon a good and valuable consideration.

Was there any substantial breach of the covenant contained in the mortgage before this action was begun?

So far as the evidence discloses, everything continued harmonious between the parties until the winter of 1895. They were then living substantially as they had for ten or fifteen years before, except that Emmett and the defendant were the only ones of the plaintiff's children who were living with her. The defendant was determined that Emmett should not remain on the farm, and the plaintiff was quite as determined that he should if she did, and apparently this was the issue which occasioned all the trouble which followed. Both parties consulted Mr. Morse, an attorney, and a proposition was made by the defendant that he would purchase a house and lot for the plaintiff in Thurso, and give her certain personal property, substantially the same as she afterwards took with her when she moved. The plaintiff rejected the proposition, and submitted another through Mr. Morse, in effect that she would accept a certain house which she mentioned, with five or six acres of land adjoining, and the same personal property above referred to, and release the defendant from all claims under the mortgage or otherwise for her support. This proposition was rejected by the defendant, and he stated to Mr. Morse that he would not give her a deed of any house and lot, but that she might move into the house which he had bought if she wanted to.

This was the state of the negotiations between the parties on the 27th day of February, 1895, when they met back of a store in Clayton, in the presence of a Mr. Rusho and his wife and the defendant's brother Joshua, and, as the plaintiff claims, the following conversation took place between herself and the defendant: He, the defendant, wanted to know "how I came across" (the ice);

I said, "afoot;" he said, "I have been to Mr. Black's to-day; I have seen him and have a house;" I said, "what for?" He said, "you have got to move;" I said, "I was not going to move;" he said, "you will move, and I will move you," and then he went away. Freeman Rusho, one of the persons named by the plaintiff as being present, was called as a witness on her behalf, and testified that he saw the defendant and the plaintiff together at the place in question, but that he did not hear any conversation like that related by the plaintiff. Mrs. Rusho testified that she was present and heard the defendant say to the plaintiff, simply, "you have got to move, because we cannot live any longer under the same roof." Joshua, the defendant's brother, although sworn, was not inquired of in regard to this alleged conversation. The defendant testified that all there was of the conversation between himself and the plaintiff was that he said, "Well, I have bought the house," and she, the plaintiff, would not talk, and I said, "I guess one house can't hold us, anyway."

On the evening of that day, February 27, 1895, the parties having returned to their home on the farm, the defendant informed the plaintiff that Emmett could not longer remain on the farm, and that he had rented it to his brother-in-law, Edgar Garnsey, and the quarrel arose which finally resulted in the plaintiff moving into the Thurso house.

The plaintiff's version of what took place upon the evening in question between herself and the defendant is stated in the most extravagant language, and if the language used by the defendant is correctly stated and his conduct correctly described by the plaintiff, it is clear that she was justified in leaving, and in concluding that it was unsafe for her to remain longer, and that a deliberate and intentional breach of the obligation to support her had been made by the defendant.

The plaintiff testified that at the time there were present Joshua Calhoun, Cal Cary and David Wiley, and they each testified that they heard no such conversation, and noticed no such conduct on the part of the defendant as related by the plaintiff. The defendant also, in the most positive terms, denies it, and states in substance that the only trouble which arose was on account of the fact that he informed the plaintiff that Emmett could not longer remain on the

farm, and that he had rented it to her son-in-law, Garnsey; that she then declared she would not remain, and insisted that he should provide a place for her to live in Thurso; that he remonstrated with her; offered to build a suitable house for her upon the farm and wished her to live there; that she refused and insisted that she would move to Thurso; that he then assented, and the arrangement was then made that the plaintiff should move into the house which he had purchased in that village; take with her what household furniture she wished, one cow, one pig, sixteen hens, and such provisions as she desired; and that, pursuant to the arrangement then made, and at the request of the plaintiff, he moved her into the house, and delivered to her, or permitted her to take with her, the property enumerated.

It is undoubtedly true that the plaintiff would have preferred to remain upon the farm, provided her son Emmett could also remain, but the evidence very clearly shows that she did not wish and would not consent to remain unless Emmett might be permitted to remain also; and finding that impossible, she voluntarily moved into the house which the defendant had provided for her.

The evidence of certain neighbors called as witnesses strongly corroborates this version of the transaction. They testified that the plaintiff stated to them after she had moved that she had settled with the defendant; made an agreement by which she released him from further support, and that she had moved in pursuance of such agreement. It also appears that she herself employed persons to help move her; that she superintended the moving herself; selected the furniture which she wanted, the provisions which she thought she needed, and the favorite cow.

We think the evidence wholly fails to justify the conclusion that there had been any breach of the covenant on the part of the defendant up to the time when the plaintiff moved into the Thurso house. It is not seriously contended that the verbal agreement under which the plaintiff removed from the farm was effectual for the purpose of relieving the defendant from the further support of the plaintiff, and the evidence clearly shows that the defendant did not so understand or regard it.

In the spring of 1895, after the plaintiff had moved into the

Thurso house, the defendant went sailing. During his absence the plaintiff made no demand upon him for money, except for a pair of shoes, and he sent her five dollars for that purpose. On his return in the winter of 1896 he drew her a load of hay, what wood she needed, a quantity of flour, pork, potatoes, beans, tea, sugar and other groceries. In the spring of 1896, before he went sailing, he drew her some more wood, and left an order with the store for her to trade upon, which she did to the amount of thirty-two dollars. Upon returning again the next winter he furnished her with wood, 100 pounds of pork, two hogs' heads, potatoes, beans, apples, tea, sugar and other groceries. During all this time the plaintiff resided within less than two miles of the farm where the defendant resided during the winters, saw him frequently, but never spoke to him, and never made any request or demand upon him for either provisions, money or anything else to aid in her support.

The defendant having made substantial provision and contribution to the support of the plaintiff up to the time of the commencement of this action, we are of the opinion that, independent of the question whether such provision and contribution was or was not sufficient to properly and adequately support the plaintiff, and fully, according to the terms of the covenant contained in the mortgage, no breach of such covenant can be declared until the plaintiff has made demand upon the defendant for other or additional support, and he has refused performance, or at least until the defendant is made aware of the necessities and requirements of the plaintiff in that regard.

From the evidence we think it cannot be said that the amount of the provisions furnished by the defendant to the plaintiff, after she moved to the Thurso house, was alone adequate to properly support her, notwithstanding it appears that the portion of the house which she did not require would have rented for fifty dollars per annum; that much of her support might have been raised from the garden, and although it appears that during the entire time she was supporting or contributing to the support of her son Emmett; but such inadequacy alone, as we have seen, is not sufficient to enable the plaintiff to maintain this action.

We are of the opinion that the evidence wholly fails to justify the conclusion that there was any substantial breach of the covenant

contained in the mortgage in suit on the part of the defendant prior to the commencement of this action; that in order to establish such breach it is necessary to show either substantially a total failure to support the plaintiff on the part of the defendant, or a demand or request for such support on her part and refusal by him.

Having reached the conclusions above indicated, it is unnecessary to consider the other questions raised by the appeal.

It follows that the judgment should be reversed and a new trial granted, with costs to the appellant to abide event.

All concurred; WILLIAMS, J., not sitting.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.